1 A.3d 723 (2010)
415 N.J. Super. 138
Paris WILSON, an infant by his Guardian Ad Litem, Sonya MANZANO, and D'Artagnan Manzano, Individually and as Administrator of the Estates of DeQuan Wilson and Dartagnania Wilson, and DeQuan Wilson and Dartagnania Wilson, Individually, Plaintiffs-Appellants,
v.
CITY OF JERSEY CITY, Police Officer Jose M. Santana (Shield No. 2853), Police Officer Ernest Vidal (Shield No. 2395), 911 Operator Laura Jean Petersen (Operator No. 35), Radio Dispatcher Michael Edward Clark, 911 Operator Brenda Murdaugh-Jones (Operator No. 326), State of New Jersey, New Jersey State Police, 911 Operator Lu Ann Burd, Defendants-Respondents, and
City of Jersey City, Police Officer Jose M. Santana (Shield No. 2853), Police Officer Ernest Vidal (Shield No. 2395), 911 Operator Laura Jean Petersen (Operator No. 35),
Radio Dispatcher Michael Edward Clark, and 911 Operator Brenda Murdaugh-Jones (Operator No. 326), Defendants-Third-Party Plaintiffs,
v.
Dwayne Wilson and 185 Martin Luther King Drive, LLC; State of New Jersey, New Jersey State Police, Third-Party Defendants.
Docket No. A-4044-08T2
Superior Court of New Jersey, Appellate Division.
Argued February 3, 2010.
Decided August 4, 2010.
*726 Brian C. Harris, Livingston, and Patrick J. Boyle (Frankfurt, Kurnit, Klein & Selz) argued the cause for appellants (Braff, Harris & Sukonick, L.L.P., attorneys; Mr. Harris, Mr. Boyle, Gloria B. Cherry, Livingston, and Lisa A. Herbert (Frankfurt, Kurnit, Klein & Selz), on the brief).
Priti Vakharia, Assistant Corporation Counsel, argued the cause for respondent City of Jersey City (William Matsikousis, Corporation Counsel, attorney; Edward J. Florio, Hoboken, of counsel and on the brief; Michael T. Cooney and Thomas R. Brophy, on the brief).
Michael A. Cifelli argued the cause for respondents Santana, Vidal, Petersen, Clark and Murdaugh-Jones (Scarinci Hollenbeck, L.L.C., attorneys; Mr. Cifelli and Robert E. Levy, Lyndhurst, of counsel and on the brief; Maureen Dougherty, Margate City, on the brief).
Vincent J. Rizzo, Jr., Deputy Attorney General, argued the cause for respondents State of New Jersey, New Jersey State Police and Lu Ann Burd (Paula T. Dow, Acting Attorney General attorney; Lewis A. Scheindlin, Assistant Attorney General, of counsel; Mr. Rizzo, on the brief).
Before Judges STERN, GRAVES, and J.N. HARRIS.
The opinion of the court was delivered by
JONATHAN N. HARRIS, J.S.C. (temporarily assigned).
Paris Wilson is the sole survivor of a tragic mass slaying. He was left for dead with life-threatening wounds as his mother and siblings lay dying nearby in their home. After enduring multiple stab wounds allegedly inflicted by his uncle, Paris was finally ablemore than thirty hours after the attackto telephone a Jersey City 9-1-1 operator for help. Rescue arrived almost immediately thereafter, but those responders could not save Paris's mother, brother, and sister who perished as a result of their grievous wounds. Unfortunately, two earlier unheeded calls to Jersey City's 9-1-1 systemone communicated during the bloodshed itselfdid not promptly bring emergency response services to stop the horrors being wreaked upon the Wilson household.
Plaintiffs in this litigation seek to hold several governmental actorstogether with their public employersjust as responsible for plaintiffs' harm as the alleged perpetrator himself. Our review in this appeal relates to summary judgment orders that extinguished plaintiffs' claims against all defendants on the grounds of several types of governmental immunities and certain evidentiary shortcomings. We affirm in part; reverse in part; and remand for further proceedings.

*727 I.

A.
Because summary judgment was granted in favor of defendants, we recite the facts most favorable to plaintiffs. Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 374, 997 A.2d 954 (2010) (citing Guido v. Duane Morris, LLP, 202 N.J. 79, 82, 995 A.2d 844 (2010) (citing Roa v. Roa, 200 N.J. 555, 562, 985 A.2d 1225 (2010))).
In the early pre-dawn hours of Tuesday, September 20, 2005, Marcia Wilson and her three young childrenDeQuan, Dartagnania, and Pariswere in their Jersey City apartment located at 185 Martin Luther King Drive, also known as 207 Wegman Parkway.[1] According to the third amended complaint, Marcia's brother Dwayne Wilsonbrutally attacked his family members with a knife, inflicting serious and, in some cases, lethal stab wounds upon each of them.
At approximately 12:50 a.m., Anthony Andrews, who was visiting in his sister's apartment across the hall from the Wilson residence, heard an uproar and used his cellular telephone to call 9-1-1. Because Andrews's emergency call originated with a cellular telephone, it was initially routed to a New Jersey State Police (NJSP) call center where it was answered by defendant Lu Ann Burd. The call lasted only a few seconds, and resulted in an immediate transfer to the Jersey City Police Department's (JCPD) 9-1-1 call center:
[Burd]: 9-1-1, where is your emergency?
Andrews: Hello, um, um at 227 Wegman. We heard somebody screaming next door, inside this building right here.
[Burd]: What town?
Andrews: Jersey City.
[Burd]: Alright hold on I'll connect you into the police department out there, hold on.
JCPD: 9-1-1 Operator 3-5, where is your emergency?
Andrews: Uh,
[Line with NJSP disconnected.]
Defendant Laura Jean Petersen, a call taker at the JCPD, received Burd's transfer and spoke with Andrews:
[Petersen]: 9-1-1 operator 3-5, where is your emergency?
Andrews: Uh-185-uh-Wegman ...
[Petersen]: 185 We
Andrews: Yeah, I hear some screamin[g] and throwing stuff, so I don't know what's going on next door. Somebody's fighting or something.
[Petersen]: Okay, and that's 185 Wegman Parkway?
Andrews: Yeah.
[Petersen]: Okay, we're going to get someone over there as soon as possible, sir.
Andrews: Alright bye.
[Petersen]: Thank you, bye bye now.
[End of call.]
In the moments between speaking with Burd and then with Petersen, caller Andrewsa non-resident of Jersey City inadvertently changed the address of the location of the emergency from "227 Wegman" to "185 Wegman Parkway." Both addresses turned out to be fatally incorrect.
At the conclusion of the call, Petersen completed a routine computer-aided dispatch *728 (CAD) ticket that was transferred to defendant Michael Edward Clark, a dispatcher at the JCPD. The CAD ticket included the incorrectly reported location of 185 Wegman Parkway. For purposes of the CAD ticket, Petersen selected the call code "F1900-Person screaming/calling for help; time elapsed not applicable; injury not applicable." In the narrative portion of the CAD ticket, Petersen inaccurately explained that the "[reporting party] hears screaming coming from house next door, no further info." Petersen gave the call a priority two, whichaccording to plaintiffs' expert witnessis the second highest response priority.
Upon receipt and review of Petersen's CAD ticket, Clark dispatched defendant police officers Jose M. Santana and Ernest Vidalwho, between them both, had less than seven months experience[2]to 185 Wegman Parkway. Both officers stated in their depositions that they were expected to respond only to the address provided by the dispatcher. Arriving at the location corresponding to 185 Wegman Parkway within five minutes of Andrews's initial 9-1-1 call, officers Santana and Vidal discovered a dwelling that appeared to be unoccupied. Santana stated that it never occurred to him they were at the wrong address because they had verified it with dispatcher Clark. The police officers were unable to find anything amiss after a brief canvass of the area around 185 Wegman Parkway.
At the officers' request, Clark attempted to re-call Andrews using the telephone number that had automatically appeared on Petersen's computer screen. He did so despite the fact that appropriate procedure required control sergeants or tour supervisors to attempt call-backs, unless the dispatcher asked specific permission to do so. Nevertheless, Clark pointed out that in regular daily practice, it was standard for dispatchers to make call-backs because otherwise the sergeants or supervisors would "be on the phone eight hours a day handling calls for four districts."
When Clark attempted to place the call-back to Andrews, the phone rang several times and then was transferred to voice mail, at which point Clark terminated the call-back without leaving a message. He explained, "[i]t's not part of our policy and procedures to leave voice mail messages on phones." Police officers Santana and Vidal suspended their incipient hunt for an emergency and resumed their regular patrol duties after having spent approximately thirty minutes at the wrong address.
Approximately twenty-two hours after making his first 9-1-1 call, Andrews placed a second 9-1-1 call at 11:09 p.m., still on Tuesday, September 20, 2005. Defendant Brenda Murdaugh-Jones of the JCPD answered the call this time:
[Murdaugh-Jones]: 9-1-1 emergency Operator 326, where is your emergency?
[Andrews]: Hello, I called the police last night
[Murdaugh-Jones]: Ex
[Andrews]: because I heardHello?
[Murdaugh-Jones]: Yes, go ahead, what did you say sir?
[Andrews]: I called the police last night because I heard a little bit of noise and reckin' (sic) in the building across the hall. It sounded like somebody was fistit sounded like somebody was fightin[g](inaudible) something. I called the police last night[.] [N]obody never came. And then all of a sudden I saw a *729 guy rush out [of] the building [and] jump in his car and skid off in his car, so ... I don't know what happened next door. So, somebody should have came out and checked. I called the police two times, they never came.
[Murdaugh-Jones]: Okay Sir, let me stop you right now because I, you know, we give people the opportunity to tell us what the life threatening emergency is, so that's the first question we do ask. Do you have a life threatening emergency that's going on right now?
[Andrews]: Excuse me?
[Murdaugh-Jones]: Do you have a life threatening emergency that's going on right now?
[Andrews]: No it would
[Murdaugh-Jones]: Alright,
[Andrews]:it happened last night.
[Murdaugh-Jones]: What you're going to do is you're going to dial back on the non-emergency numberokay? The number you need to be dialing is 201-547
[Andrews]: See they should have come yesterday[.]
[Hang up.]
Murdaugh-Jones explained in her deposition that she was trained to get off the 9-1-1 phone lines as soon as possible so that they are not tied up. In the case of Andrews's call, she listened to see if it involved a contemporaneous life-threatening event, and believed that Andrews hung up before she finished providing the Police Department's non-emergency telephone number.
Meanwhile, back in the Wilson apartment, Paris had awoken on the Tuesday of the attack around 9:45 a.m. During the one hour he was conscious, he recalled hearing his sister request water but he was unable to get up to help her. His brother told Paris that they needed to find their mother's cellular phone, but Paris again lost consciousness and did not awake again until "close to the afternoon," which actually turned out to be the late morning, on Wednesday, September 21, 2005. At that point, his brother was barely alive but somehow had moved himself into another room. Paris finally managed to call 9-1-1 and direct the police to the apartment approximately thirty-four hours after the assault was first launched. By the time help finally arrived, Paris was the only one in the apartment to have survived.

B.
Plaintiffs filed their initial complaint on August 9, 2006. On October 8, 2008, they filed a third amended complaint,[3] alleging: (1) negligence, gross negligence, and wanton and willful disregard for the safety of others against Jersey City-employed defendants Petersen, Murdaugh-Jones, Clark, Santana, and Vidal; (2) respondeat superior, negligent retention, training, and supervision against Jersey City; (3) negligence, gross negligence, and wanton and willful disregard for the safety of others against NJSP-employed defendant Burd; and (4) respondeat superior against the State of New Jersey and the NJSP.
In March 2009, all defendants moved for summary judgment. Plaintiffs thereupon cross-moved for partial summary judgment against Petersen and Murdaugh-Jones. On April 15, 2009, in a written decision memorialized by four separate orders, the court granted all of defendants' *730 motions and denied plaintiffs' cross-motion. This appeal ensued.

II.

A.
We start with first principles: a trial court will grant summary judgment to a moving party only "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c); see also Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523, 666 A.2d 146 (1995); Carlson v. City of Hackensack, 410 N.J.Super. 491, 494-95, 983 A.2d 203 (App.Div.2009). "An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." R. 4:46-2(c).
On appeal, "the propriety of the trial court's order is a legal, not a factual, question." Pressler, Current N.J. Court Rules, comment 3.2.1 on R. 2:10-2 (2010). We employ the same standard that governs trial courts in reviewing summary judgment orders. Chance v. McCann, 405 N.J.Super. 547, 563, 966 A.2d 29 (App.Div. 2009). Thus, we contemplate, as did the Law Division, "`whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-46, 916 A.2d 440 (2007) (quoting Brill, supra, 142 N.J. at 536, 666 A.2d 146).
The motion judge determined that all of the defendants were entitled to governmental immunity from liability, but through slightly different statutory devices. The City of Jersey City was held to be immunized from plaintiffs' claims by three different provisions: N.J.S.A. 59:2-3; N.J.S.A. 59:2-10; and N.J.S.A. 52:17C-10(e). The individual Jersey City employees were found to be similarly immunized by diverse combinations of N.J.S.A. 59:3-2 (Petersen, Murdaugh-Jones, Santana, and Vidal); N.J.S.A. 59:5-4 (Santana and Vidal); and N.J.S.A. 52:17C-10 (Petersen, Murdaugh-Jones, and Clark). Lastly, the State defendantsBurd, the NJSP, and the State of New Jerseywere each determined to enjoy immunity pursuant to N.J.S.A. 52:17C-10.[4]
Commonly understood, the motion judge found two sources of immunity. First, she held that particularized immunity provisions of the Tort Claims Act (TCA), N.J.S.A. 59:1-1 to 12-3, shielded several defendants from liability. Second, she determined that N.J.S.A. 52:17C-10 (Title 52 immunity) protected all of the governmental actors (with the exception of police officers Santana and Vidal) and their employers from suit. Lastly, the motion judge found that without a supporting expert opinion, plaintiffs' tort claims for negligent training, supervision, and retention were inadequate to present to a jury. We do not entirely subscribe to the motion judge's point of view on these issues, for the following reasons.

*731 B.
Plaintiffs submit that they presented clear evidence that Jersey City call takers Petersen and Murdaugh-Jones, as well as dispatcher Clark, ignored mandatory policies and procedures, which requires disenfranchisement of both their and Jersey City's TCA immunity claims. With respect to Jersey City police officers Santana and Vidal, plaintiffs contend that the question of whether the officers' abbreviated and abruptly-ended investigation at 185 Wegman Parkway was unreasonable should have been left to a jury for its determination. In essence, plaintiffs assert that once having become involved with Andrews's emergency call, each of these governmental actors negligently performed ministerial duties in their responses. For purposes of the summary judgment disposition, we agree with some, but not all, of plaintiffs' contentions.
Plaintiffs' evidence, interpreted indulgently, demonstrated that the 9-1-1 call takers did not follow published protocol and failed to ask Andrews the basic information of who, what, where, and when as prescribed by the standard operating procedures of the JCPD.[5] Although Andrews's initial communication about the location of the assaults was concededly inconsistent and faulty, plaintiffs' experts opined that the harm suffered by the Wilson family would have been substantially mitigated if, in the two brief exchanges with Andrews, the Jersey City call takers had fully complied with the Manual's "should obtain" admonition to collect the necessary background information from the caller. If Andrews's own location had been requested (he was just across the hallway from the Wilson apartment in 185 Martin Luther King Drive), and an accurate call-back telephone number had been obtained, the police officers would have probably found the Wilson family within an hour of the deadly assault. Had there been a more thorough compilation of information during Andrews's second 9-1-1 call, emergency resources could have been provided to the victims within twenty-four hours of the bloodshed, which might have ultimately saved their lives. Plaintiffs argue that dispatcher Clark was similarly short-sighted when he tried to call Andrews back at the behest of the police officers, only to suddenly terminate the call when transferred to voicemail. The failure to leave a voicemail message instructing Andrews to call the dispatcher back contributed to the evolving harm at the scene of the crime.
As for the police officers' conduct, plaintiffs argue that it was woefully incomplete and inadequate. Plaintiffs claim that the rookie police officers put off any further pursuit of pertinent information that might lead them to the exigent event because they viewed it as something reserved for detectives, not patrol officers. Plaintiffs highlight the close locational proximity of the actual crime scene to where the police officers were actually sentsupposedly less than 200 feet apartas further evidence of a negligently-conducted search for an emergency situation.
Jersey City and its employees sought refuge under the correlative principles embodied in N.J.S.A. 59:2-3(d) and N.J.S.A. 59:3-2(d), both relating to the exercise of judgment or discretion by public agents. Additionally, the police officers asserted they were entitled to the protection of N.J.S.A. 59:5-4, which provides immunity for the failure of a public entity and its *732 employees to provide police protection service or sufficient police protection service to members of the public.
These defendants argue that all of the employees' actions were animated by purposive discretionary choices made in the heat of the moment, and were informed by the limited public resources available to them. Petersen, for example, claimed that she was in the midst of addressing another emergency call that was vying for her time and commanded her attention. Murdaugh-Jones contended that she was trained to divert non-emergency calls as quickly as possible to appropriate channels in order to remain available for authentic exigent situations. Clark asserted that he should not have even attempted the call-back to Andrews in the first place, as that task was reserved for supervisory personnel only. Santana and Vidal argued that their decision to suspend their mission was impelled by the demands and burdens of being patrol officers with numerous other assignments to juggle. Although we share empathy for each of these defendants' explanations of their conduct, and except for the police officers and the dispatcher, we are unconvinced that they were performing anything besides ministerial acts. As such, if those acts or omissions were negligently done and proximately linked to a plaintiff's harm, it would expose one or more of them, as well as their public employer, to liability and damages, notwithstanding the TCA.
According to N.J.S.A. 59:3-2(d), a public employee[6]
is not liable for the exercise of discretion when, in the face of competing demands, he determines whether and how to utilize or apply existing resources, including those allocated for equipment, facilities and personnel unless a court concludes that the determination of the public employee was palpably unreasonable.
In Del Tufo v. Twp. of Old Bridge, 278 N.J.Super. 312, 324, 650 A.2d 1044 (App. Div.1995), aff'd, 147 N.J. 90, 685 A.2d 1267 (1996), we stated that two conditions had to be satisfied before this immunity could be properly applied. "First the challenged conduct must constitute the `exercise of discretion.' Secondly, the conduct must be a determination whether and how to utilize resources `in the face of competing demands.'" Id. at 324-25, 650 A.2d 1044.
A public entity or employee of such bears the burden to plead and prove immunity under the TCA. Wymbs v. Twp. of Wayne, 163 N.J. 523, 539, 750 A.2d 751 (2000). Thus, the burden of proving that there were "competing demands" is on defendants in this case. Manna v. State, 129 N.J. 341, 351, 609 A.2d 757 (1992). See also Morey v. Palmer, 232 N.J.Super. 144, 148, 556 A.2d 811 (App.Div.1989) (stating that "specifically, with respect to motions for summary judgment based on municipal tort immunities, the burden is on the public entity both to plead and prove its immunity under the Act").
Our appraisal of the record, when viewed under the lens of Brill's generosity to the non-movant plaintiffs, convinces us that there were genuine disputed facts relating to the two Jersey City call takers' performance of ministerialnot discretionaryacts. We take our lead from Massachi v. AHL Serv., Inc., 396 N.J.Super. 486, 935 A.2d 769 (App.Div.2007), certif. denied, 195 N.J. 419, 949 A.2d 847 (2008), which held that "where police officers negligently *733 perform ministerial duties, ... `N.J.S.A. 59:5-4 does not insulate [them] from [the] unfortunate results of their negligently executed ministerial duties.'" Id. at 496, 935 A.2d 769 (quoting Suarez v. Dosky, 171 N.J.Super. 1, 10, 407 A.2d 1237 (App.Div.1979), certif. denied, 82 N.J. 300, 412 A.2d 806 (1980)).
Similarly, N.J.S.A. 59:3-2(d) and N.J.S.A. 59:2-3(d) do not provide immunity from liability for negligence in performance of ministerial police duties once the police have decided to protect. Suarez, supra, 171 N.J.Super. at 9-10, 407 A.2d 1237; Massachi supra, 396 N.J.Super. at 495-96, 935 A.2d 769. An act is "ministerial" if it is "[o]ne which a person performs in a given state of facts in a prescribed manner in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment upon the propriety of the act being done." Morey, supra, 232 N.J.Super. at 151, 556 A.2d 811.
With these principles in mind, we conclude that the actions of the dispatcher and the police officers were each non-ministerial in nature. Dispatcher Clark is faulted for failing to follow a stated policy of enlisting a superior officer before attempting the call-back to Andrews. Even though this arguably contravened a standard operating procedure, the record conclusively demonstrates that dispatchers' decisions to make call-backs or to involve superior officers were routine discretionary acts linked to a scarce human resource: the availability of supervisory staff members, who had multiple other tasks to perform.
As for the manner in which the search around 185 Wegman Parkway was managed, we determine that the competing demands associated with protecting and serving the public and the need to be available for general police services made the police officers' conduct in those circumstances reasonable, discretionary, and immune from liability. See N.J.S.A. 59:5-4; cf. Lee v. Doe, 232 N.J.Super. 569, 557 A.2d 1045 (App.Div.1989) (no immunity pursuant to N.J.S.A. 59:5-4 where police left scene and perpetrator returned to inflict harm upon plaintiff).
The claimed breaches of duty by the call takers, however, relate to their less than stellar on-the-scene behavior, not to governmental policy decisions that might benefit from immunity. Accordingly, Jersey City and its call takers do not enjoy similar TCA immunity. We emphasize that our point of view does not require a jury to conclude that these governmental actors conducted themselves negligently, or even if they were negligent, that such conduct proximately contributed to a plaintiff's harm. Rather, we simply cannot find that TCA immunity exists under the indulgent state of facts that we have identified for the summary judgment analysis. Plaintiffs should not be deprived of the right to present an appropriate factual backdrop and expert opinion to a jury for its thoroughgoing review. Whether plaintiffs will succeed in persuading the jury of the alleged breaches of duty and the more thorny issue of proximate cause, remains to be seen.
Our analysis of the State defendants' entitlement to TCA immunity does not take a different course. Indeed, the State concedes that Burd's transfer of Andrews's first 9-1-1 call to Petersen was a ministerial act. However, the State defendants argue that even under a Brill magnifying glass, no rational trier of fact could conclude that Burd's conduct was negligent. We agree.
Plaintiffs' 9-1-1 expert, Paul Linnee, opined in his report that Burd's actions in the manner of transferring Andrews's call were palpably unreasonable and grossly *734 negligent. He took issue with the manner in which Burd transferred the call, as well as with the fact that she did not stay on the line long enough to ensure that Andrews transmitted the same information he initially relayed to her. If she had, it was conceivable that Andrews's locational discrepancies would have been realized and corrected, which might have prevented later confusion as to the true location of the ongoing crime.
Linnee characterized Burd's action as an unannounced blind transfer, despite the fact that she told Andrews she was transferring his call. The expert claimed that Burd's conduct contravened N.J.A.C. 17:24-2.3(a)(7), which prohibits blind transfers: "No call-taker shall transfer a 9-1-1 call without first advising the calling party that the call is being transferred and that the caller should remain on the line until the call is connected. No `blind transfers' are permitted." However, we find that Burd clearly did not engage in a blind transfer. Linnee opined that Burd should have followed the National Emergency Number Association's (NENA) Call Taking Operational Standards, which suggest that call takers "should stay on the line until the connection is complete and all pertinent information has been relayed to the answering" call taker. Linnee noted that contrary to N.J.A.C. 17:24-2.3(a)(7), "every other 9[-]1[-]1 system's call transferring protocols" he had reviewed required not only that the first call taker ensure that a connection was made, but also stay on the line to be satisfied that "the caller's critical information is being effectively passed on" to the next call taker.
Even if we were to hypothetically engraft NENA's provisions onto New Jersey's 9-1-1 operational standards, and then conclude that Burd had neglectfully terminated her call involvement until Andrews gave the next call taker an address different from the address he told Burd, plaintiffs have failed to show how this constitutes negligence. Both the first address227 Wegmanand the second address185 Wegmanwere incorrect. We cannot conceive how a rational trier of fact could concludewithout engaging in rank speculation and conjecturethat any change in the duration of Burd staying on the line would have made any conceivable difference to those being assaulted in the apartment at 185 Martin Luther King Drive. However, because Burd properly performed her ministerial duties as specified in N.J.A.C. 17:24-2.3(a)(7), and no evidence was submitted demonstrating that she was actually required to do anything further, Burd, the NJSP, and the State were all entitled to summary judgment as a matter of law, regardless of the absence of TCA immunity.

C.
All of the non-police officer defendants claim that they are immune from liability pursuant to N.J.S.A. 52:17C-10(e). The motion judge agreed, but we do not.
When the original 1989 statute establishing the 9-1-1 Commission and Office of Emergency Telecommunications Service to plan, design, and implement the statewide emergency 9-1-1 telephone system was adopted, N.J.S.A. 52:17C-10(b) (since repealed) provided the following limitations of liability:
No telephone company, public safety answering point, agents of, or manufacturer supplying equipment to a telephone company or PSAP, shall be liable to any person who uses the enhanced 9-1-1 service established under this act for release of [the telephone number and street address of any telephone used to place a 9-1-1 call], including non-published telephone numbers, or for failure *735 of any equipment or procedure in connection with the enhanced 9-1-1 service or for any act or the omission of an act committed while in the training for or in rendering PSAP services in good faith and in accordance with this act.
[N.J.S.A. 52:17C-10(b).]
As written, this section of the statute promised that no liability could be found in favor of "any person who uses the enhanced 9-1-1 service established under this act" against telephone companies; PSAPs; equipment suppliers and manufacturers; and their agents for three distinct types of conduct:
 "for release of [the telephone number and street address of any telephone used to place a 9-1-1 call], including non-published telephone numbers" (release of information).
 "for failure of any equipment or procedure in connection with the enhanced 9-1-1 service" (failure of equipment or procedure).
 "for any act or the omission of an act committed while in the training for or in rendering PSAP services in good faith and in accordance with this act" (act or omission while rendering PSAP services).
On its face, the third type of immunity ensured a broad spectrum of coverage for any act or omission connected with "rendering PSAP services in good faith and in accordance with this act," without reservation. In its statutory definition, a PSAP was described as having been "assigned the responsibility of receiving 9-1-1 calls and, as appropriate, directly dispatching emergency response services or transferring or relaying emergency 9-1-1 calls to other public safety agencies." N.J.S.A. 52:17C-1(l). Although undefined by statute, an "emergency response service" presumably included law enforcement agents (police officers), as well as emergency responders (firefighters; members of first aid, rescue and ambulance squads; and hazardous materials workers). Thus, the immunity provisions in the 1989 statute provided protection to PSAPs and their agents when information gleaned from 9-1-1 calls was handed off to all such services.
N.J.S.A. 52:17C-10(b) was repealed, and subsections (c), (d), and (e) were added to N.J.S.A. 52:17C-10 in 1999, at a time when several other amendments were adopted in part to recognize that the Federal Communications Commission was requiring wireless telephone companies to provide wireless enhanced 9-1-1 service. See Senate Law & Public Safety Committee, Statement to Senate Bill No. 1495 (Jan. 25, 1999). "[T]he bill also clarifies existing limitations of liability for telephone companies, wireless telephone companies and other entities in connection with enhanced 9-1-1 service and wireless enhanced 9-1-1 service and in connection with supplying assistance to investigative or law enforcement officers." Ibid. It also "provid[ed] that the limitation of liability would be inapplicable in the event of wanton or willful disregard for the safety of persons or property." Ibid.
The newly re-configured provisions for limitations of liability appear in the 1999 statute as follows:
c. No telephone company, person providing commercial mobile radio service as defined in 47 U.S.C. [§ ]332(d), public safety answering point, or manufacturer supplying equipment to a telephone company, wireless telephone company, or PSAP, or any employee, director, officer, or agent of any such entity, shall be liable for damages to any person who uses or attempts to use the enhanced 9-1-1 service, wireless 9-1-1 service or wireless enhanced 9-1-1 service established under this act for release of the *736 information specified in this section, including non-published telephone numbers. This limitation of liability is inapplicable if such failure resulted from a malicious purpose or a wanton and willful disregard for the safety of persons or property.
d. No telephone company, person providing commercial mobile radio service as defined in 47 U.S.C. [§ ]332(d), public safety answering point, or manufacturer supplying equipment to a telephone company, wireless telephone company, or PSAP, or any employee, director, officer, or agent of any such entity, shall be liable to any person for civil damages, or subject to criminal prosecution resulting from or caused by any act, failure or omission in the development, design, installation, operation, maintenance, performance or provisioning of any hardware, software, or any other aspect of delivering enhanced 9-1-1 service, wireless 9-1-1 service or wireless enhanced 9-1-1 service. This limitation of liability is inapplicable if such failure resulted from a malicious purpose or a wanton and willful disregard for the safety of persons or property.
e. No telephone company, person providing commercial mobile radio service as defined in 47 U.S.C. [§ ]332(d), public safety answering point, or manufacturer supplying equipment to a telephone company, wireless telephone company, or PSAP, or any employee, director, officer, or agent of any such entity, shall be liable to any person for damages resulting from or in connection with such entity's provision of any lawful assistance to any investigative or law enforcement officer of this State or a political subdivision of this State, of the United States, or of any other state or a political subdivision of such state in connection with any lawful investigation by or other law enforcement activity of the law enforcement officer unless the entity, in providing such assistance, acted in a manner exhibiting wanton and willful disregard for the safety of persons or property.
[N.J.S.A. 52:17C-10(c), (d), (e).]
At first blush it appears that subsection (c) corresponds with the 1989 legislation's limitation of liability for the release of information. Subsection (d) appears to match up with the 1989 legislation's limitation on liability in the case of a failure of equipment or procedure. Lastly, subsection (e) is arguably related to the 1989 legislation's limitation on liability for an act or omission while rendering PSAP services. However, a more detailed examination of the language reveals that these parallels are irrelevant because all of the 1989 limitations on liability protected a PSAP and its agents only from claims by "any person who uses the enhanced 9-1-1 service." Plaintiffs do not enjoy this status because they did not personally use the 9-1-1 system.[7] Thus, if the 1989 legislation were still in effect, defendants would not be entitled to immunity. We cannot simply assume that the 1999 law replicated the three areas of immunity from its predecessor; indeed, the whole complexion of the limitations of liability was altered.
We observe that the legislative history surrounding the 1999 amendment is not consistent. As already noted, the report of the Senate Law & Public Safety Committee averred that the statutory amendment "clarifies existing limitations of liability." Conversely, the Assembly Policy and Regulatory Oversight Committee and the Assembly Appropriations Committee *737 reported that the bill "alters the existing limitation of liability language to include wireless enhanced 9-1-1 service, except in the event of wanton or willful disregard for the safety of persons or property." See Assembly Policy and Regulatory Oversight Committee, Statement to [First Reprint] Senate No. 1495 (March 18, 1999); Assembly Appropriations Committee, Statement to [First Reprint] Senate No. 1495 (May 3, 1999). Lastly, the bills' Sponsors' statements appended to the proposed legislation in November 1998, speak of "an expanded limitation of liability." See Sponsor's Statement to S. 1495 (Nov. 16, 1998); Sponsor's Statement to A. 2581 (Nov. 9, 1998).
Thus, we are confronted with three disparate expressions of the legislative intent of the 1999 law regarding its limitations of liability:
 "[C]larifies existing limitations of liability." See Senate Law & Public Safety Committee, Statement to Senate Bill No. 1495 (Jan. 25, 1999).
 "[A]lters the existing limitation of liability." See Assembly Policy and Regulatory Oversight Committee, Statement to [First Reprint] Senate No. 1495 (March 18, 1999); Assembly Appropriations Committee, Statement to [First Reprint] Senate No. 1495 (May 3, 1999).
 "[E]xpand[s] limitation of liability." See Sponsor's Statement to S. 1495 (Nov. 16, 1998); Sponsor's Statement to A. 2581 (Nov. 9, 1998).
Before interpreting the limitation of liability provisions contained in the statute, we must first resolve a prefatory issue. Plaintiffs contend that the Jersey City defendants do not qualify for Title 52 immunity because Jersey City was not acting as a PSAP. A "[p]ublic safety answering point (PSAP)" is defined as:
a facility, operated on a 24-hour basis, assigned the responsibility of receiving 9-1-1 calls and, as appropriate, directly dispatching emergency response services or transferring or relaying emergency 9-1-1 calls to other public safety agencies. A public safety answering point is the first point of reception by a public safety agency of 9-1-1 calls and serves the jurisdictions in which it is located or other participating jurisdictions.
[N.J.S.A. 52:17C-1(l).]
A public safety agency is defined as "a functional division of a municipality, a county, or the State which dispatches or provides law enforcement, fire fighting, emergency medical services, or other emergency services." N.J.S.A. 52:17C-1(j).
Plaintiffs seek to debar Jersey City from its status as a PSAP because it was the secondnot "the first"site to answer Andrews's call. However, the plain language of the statute does not require that a PSAP be the first answering site for an emergency call, but rather that it be "the first point of reception by a public safety agency of 9-1-1 calls." N.J.S.A. 52:17C-1(l). Thus, in this case the NJSP call center was the PSAP for the State's emergency dispatches, and Jersey City's call center was the PSAP for Jersey City's emergency dispatches. Whether, as in this case, a call is transferred from another PSAP does not change the ultimate receiver's status if it independently acts as the PSAP for its assigned territory.
Having established that Jersey City and the NJSP both functioned as PSAPs in this case, we must then analyze whether, with respect to Andrews's calls, the PSAPs were "provi[ding] any lawful assistance to any investigative or law enforcement officer ... in connection with any lawful investigation by or other law *738 enforcement activity of the law enforcement officer." N.J.S.A. 52:17C-10(e). This requires the application of our jurisprudential tools relating to statutory interpretation.
A court's most important objective when interpreting a statute is to "discern the meaning and intent of the Legislature." State v. Gandhi, 201 N.J. 161, 176, 989 A.2d 256 (2010); see also State v. Friedman, 413 N.J.Super. 480, 486, 996 A.2d 457 (App.Div.2010). "[G]enerally, the best indicator of that intent is the statutory language," DiProspero v. Penn, 183 N.J. 477, 492, 874 A.2d 1039 (2005), and the plain meaning of the statute's words are understood in accordance with the "generally accepted meaning" of the words. Carlson, supra, 410 N.J.Super. at 495, 983 A.2d 203. "If the plain language leads to a clear and unambiguous result, then [the] interpretive process is over." Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 195, 927 A.2d 543 (2007) (internal citation omitted).
On the other hand, if the plain language of the statute is susceptible to more than one understanding, only then may a court may consider other sources to determine the meaning of a statute. Aponte-Correa v. Allstate Ins. Co., 162 N.J. 318, 323, 744 A.2d 175 (2000). When the language is unclear, legislative history is one available source to determine the meaning of a statute. G.S. v. Dep't of Human Servs., 157 N.J. 161, 172, 723 A.2d 612 (1999).
Defendants contend that the plain language of N.J.S.A. 52:17C-10(e) provides for a broad limitation of liability. They do not address the seeming incongruity of an allegedly broad limitation of liability that only applies to the limited context of "assistance to any investigative or law enforcement officer," leaving out the myriad other situationsfire, medical emergency, hazardous materials spillthat would not be within the orbit of the statute's immunities.
Plaintiffs argue that a close examination of the entirety of N.J.S.A. 52:17C-10 suggests that it only applies to "assistance" that may be provided after an investigation or other law enforcement activity has already commenced. More specifically, they contend that it refers only to the provision of assistance to an officer in connection with that particular individual's already-ongoing investigation or activity.
At the time the call takers in this case acted upon Andrews's 9-1-1 calls, they were not rendering assistance to any particular officer with respect to an already existing investigatory activity. Rather, all they were doing at those times was facilitating the dispatch of emergency response services pursuant to N.J.S.A. 52:17C-1(l). By serving as the vanguard between a member of the public who requests emergency services or alerts the call taker to an emergency situation and the public entity that provides them, the call taker's role is narrowly focused and swiftly completed. However brief, this task is of signal importance to the caller and to the public interest. Only after the call taker has determined the nature of the situation, collected all relevant information, and passed that information on for dispatch, is it possible that an investigation or related law enforcement activity may commence. In other words, in the tumultuous moments during the first stages of a reported emergency, the call taker is not assisting an investigation; she is facilitating and participating in a dispatch, which is a defined responsibility of a PSAP. It is only after the dispatch is made, in the ordinary case, that an investigation might be opened or other activity commenced by law enforcement.
*739 No such investigation truly commenced in this case until Paris Wilson was found alive on Wednesday, September 21, 2005, although Santana and Vidal's request to Clark to initiate a call-back to Andrews a day earlier bore the mark of such an investigation as well. It was only then that there was a statutorily-described investigation to assist, not before. Subsequently, in connection with that investigative activity, law enforcement personnel may seek assistance from the PSAP, at which point the immunity provided by N.J.S.A. 52:17C-10(e) would become effective.
N.J.S.A. 52:17C-10(e)'s particularized limitation on liability makes sense when considered within the statutory scheme and in relation to the other provisions of N.J.S.A. 52:17C-10. Interpreting subsection (e) in the manner proposed by defendants would mean that whenever a call taker responded to a 9-1-1 call requiring dispatch of police, both the call taker and PSAP would automatically become immune from suit for anything other than those actions constituting wanton and willful disregard for the safety of persons or property. Such an interpretation would render subsections (c) and (d) of N.J.S.A. 52:17C-10 irrelevant as surplusage. "Fundamental rules of statutory construction militate against an interpretation of a statute that requires a court to assume that a provision is surplusage; the presumption is `that every word in a statute has meaning.'" Fletcher v. Cessna Aircraft Co., 412 N.J.Super. 530, 536, 991 A.2d 859 (App. Div.2010) (quoting In re Att'y Gen.'s "Directive on Exit Polling: Media & Non-Partisan Pub. Interest Groups," 200 N.J. 283, 298, 981 A.2d 64 (2009)). Interpreting subsection (e) to grant immunity to PSAPs and call takers with respect to any and all actions taken regarding calls that lead to police dispatch would entirely eliminate the need for subsections (c) and (d). It also ignores the common sense difference between a dispatch of emergency response services and a law enforcement investigation or other related activity.
Moreover, had the Legislature intended to immunize call takers and PSAPs for the general handling of 9-1-1 calls leading to a police response, it could have simply stated in plain language that neither would be liable for damages resulting from the handling of emergency calls. Instead, it restricted immunity only to situations involving the "entity's provision of lawful assistance," without reference to individual call takers' provision of such lawful assistance.
Here, at the time of Andrews's first call, neither State call taker Burd nor Jersey City call taker Petersen was providing lawful assistance to officers with respect to a concurrent investigation or other law enforcement activity. The same is true of Murdaugh-Jones' handling of Andrews's second call, particularly in light of the fact that she never even contacted the police. The absence of her or the PSAP's "provi[ding] of any lawful assistance" is manifest. Thus the protective mantle of Title 52 was unavailable to these individuals and their respective employers.
With respect to dispatcher Clark, however, at the time the dispatched police officers requested that he attempt to call back Andrews and obtain more information, he was lawfully assisting the officers with their concurrent investigatory activity of trying to locate the proper address of the emergency. Clark's inability to contact Andrews was due, in part, to the fact that the 9-1-1 call system utilized by Jersey City did not effectively record the unique cellular telephone number from which Andrews called. Plaintiffs presented no evidence that Clark's conduct was rendered "in a manner exhibiting wanton and willful disregard for the safety of persons *740 and property." Thus, Clark remained entitled to Title 52 immunity and the motion judge's dismissal of all claims against him was proper.
Thus, we conclude that under the facts and circumstances of this case, immunity for Jersey City, Petersen, and Murdaugh-Jones pursuant to N.J.S.A. 52:17C-10(e) is unavailable. Their conduct consisted of facilitating a dispatch, which is a primary function of a call taking agent of a PSAP. Immunity for Clark's limited call-back exists only because he was performing a mere secondary responsibility as an agent of a PSAP in assisting the lawful investigatory activity by law enforcement.[8]
As for the State defendants, the statute similarly does not provide them with immunity, but we remain convinced that Burd's conduct cannot by any rational means be proximately linked to any of plaintiffs' resulting harm. The dismissal of all claims against the State defendants was therefore properly granted, notwithstanding the absence of Title 52 immunity.

D.
We next address the dismissal of plaintiffs' claims against the Jersey City for negligent training, supervision, and retention. The motion judge granted summary judgment in favor of Jersey City on this claim because "the mere actions of the employees themselves without expert testimony to establish the standard of care is insufficient to substantiate plaintiff's claim that Jersey City fell below the standard of care in training, supervising and or retaining the individual defendants." After a review of the motion record we see no abuse of discretion that would permit us to interfere with the court's discretionary determination on this evidentiary issue. Plaintiffs' remaining arguments on appeal lack sufficient merit to warrant discussion in a written opinion beyond the brief comments that follow. R. 2:11-3(e)(1)(E).
Plaintiffs contend that Jersey City neglected to follow its internal procedures for training and supervising its call takers, did not properly disseminate the Manual that defined their duties and responsibilities, and did not ensure that the employees retained their Manuals, despite policies to the contrary. Nevertheless, none of these putative defalcations is incorporated in an expert opinion concerning the standard or level of training and follow-up that is appropriately required of 9-1-1 employees. The legal question posed by these circumstances is well outside the awareness of a person of average intelligence and ordinary experience, the typical traits required of jurors. Estate of Chin v. St. Barnabas Med. Ctr., 160 N.J. 454, 469, 734 A.2d 778 (1999). The doctrine of common knowledge is not applicable to the esoteric realm of emergency telecommunications facilities, at least in the circumstances of this case.
Plaintiffs contend that certain untoward conduct of the Jersey City employees bears upon their employer's determination to allow them to remain on the job and work on the day of the incident. Although the record contains evidence of disciplinary actions taken against Petersen, Murdaugh-Jones, and Clark, several of those incidents occurred after the events of this case and, thus, are not relevant here. An assertion of negligence requires proof of harm caused by a breach of duty. *741 Polzo v. County of Essex, 196 N.J. 569, 584, 960 A.2d 375 (2008). Here, there is no evidence that would permit a rational trier of fact to conclude that plaintiffs suffered any harm as a result of anything these employees did or failed to do after the day in question.
We also note in passing that although the plaintiffs' theory of liability is independent of harm caused by an employee, the concept of negligent training, supervision, and retention generally has no significance where, as here, the injury is alleged to have been caused by an employee's negligence in the performance of his or her duties. Hoag v. Brown, 397 N.J.Super. 34, 54, 935 A.2d 1218 (App.Div.2007). That is so because an employer is vicariously responsible for the negligent acts of an employee acting within the scope of his or her employment "under standard agency principles" even if the employer was diligent in hiring, training, supervising and retaining the employees. See Mavrikidis v. Petullo, 153 N.J. 117, 133-34, 707 A.2d 977 (1998) (observing that the tort is not applicable when the employer's liability can be established under the principle of respondeat superior).
On the other hand, the employer's negligence with respect to selection, retention, and supervision of employees is important when the employee is acting outside the scope of employment. Di Cosala v. Kay, 91 N.J. 159, 173, 450 A.2d 508 (1982). The allegations in this case cannot reasonably support such an interpretation, making the claim by plaintiffs unsupportable.

E.
Lastly, we conclude that the motion judge was correct in denying partial summary judgment to plaintiffs on their affirmative claims against call takers Petersen and Murdaugh-Jones. Even though plaintiffs' version of defendants' respective conduct could lead to a finding of negligent performance of a ministerial act, a rational trier of fact would not inevitably render that same conclusion. Moreover, given the attenuated proximate cause present in this case, it would have been grossly prematureeven if negligence were establishedto grant even partial summary judgment for plaintiffs. The motion judge's decision in this respect is unexceptionable.
In summary, we affirm the dismissals with prejudice of all claims against dispatcher Clark, police officers Santana and Vidal, as well as against the State, the NJSP, and its employee Burd. We reverse the dismissals as against Jersey City and its two call takers Petersen and Murdaugh-Jones. Those surviving claims are remanded to the Law Division for further proceedings in accordance with this opinion. We do not retain jurisdiction.
Affirmed in part; reversed in part; and remanded.
NOTES
[1] The apartment building is located at the intersection of Martin Luther King Drive and Wegman Parkway.
[2] Santana was sworn in as a police officer in April 2005; Vidal was sworn in as a police officer in August 2005.
[3] Plaintiff Paris Wilson is an infant, and is represented in the third amended complaint by a guardian ad litem, his aunt Sonya Manzano. Plaintiff D'Artagnan Manzano, father of Paris, Dartagnania, and DeQuan Wilson, is a party in the third amended complaint individually, and as the administrator of the estates of Dartagnania and DeQuan Wilson.
[4] The motion judge's written "Decision of the Court" only addressed the liability of the State, finding immunity pursuant to N.J.S.A. 52:17C-10. One of the final orders in this case, however, granted summary judgment in favor of defendants Burd, the NJSP, and the State. We assume that by entering this final order, the motion judge intended that her rationale for the State's immunity would apply to the other two State defendants as well.
[5] 9-1-1 call takers in Jersey City are trained using a manual prepared under the auspices of the Jersey City Police Department Central Communications Bureau entitled Call Taker Policy and Procedures Reference Manual (Codified 7/99) (Manual).
[6] N.J.S.A. 59:2-3(d) provides, in similar fashion, for immunity covering discretionary activities that runs in favor of the public entity.
[7] We note that plaintiff Paris Wilson did access the 9-1-1 system more than twenty-four hours after he was attacked, but neither he nor the other plaintiffs take issue with the outcome of that call, which ultimately rescued him.
[8] Although providing immunity only for a secondary role may seem anomalous, it strikes us that if broad immunity were intended to apply as defendants contend, leaving out all emergency response services except law enforcement would be even more incongruous and inexplicable. We leave it to the Legislature to decide the proper contours of the limitations of liability, if any, for PSAPs and their agents.